## A99A0743. QUILL v. NEWBERRY.
(518 SE2d 189)

ELDRIDGE, Judge.

Plaintiff/appellant Robert Quill appeals from an order of the Superior Court of DeKalb County granting defendant/appellee Scott Newberry's motion for summary judgment on Quill's complaint in equity seeking to rescind a contract of sale for Newberry's former residence based on fraud. Quill contends that said contract was induced by Newberry's allegedly fraudulent misrepresentations about and concealment of an active termite infestation. Because the evidence in this case is in conflict and raises factual issues to be decided by a jury, we conclude that the trial court's grant of summary judgment was error.

Viewed in a light most favorable to the non-moving party,[1] i.e., Quill, the evidence shows that appellee Scott Newberry purchased a townhouse located at 892 Argonne Avenue in midtown Atlanta, DeKalb County. At that time, a wooden addition had already been added to the ground floor of the back of the house. The addition served as a sunroom/eating area annexed to the kitchen. The floor of the addition was of the same aged hexagonal tile that covered the kitchen floor.

Newberry lived in the house for five years, from February 1992 through July 1997. After moving into the house, Newberry had installed sheetrock walls in the kitchen and addition. By 1997, the sheetrock showed places where the drywall had been repaired since Newberry installed it. Also in January 1997, Newberry replaced a

---

[1] *Lau's Corp. v. Haskins*, 261 Ga. 491 (405 SE2d 474) (1991).

small area rug that for the prior five years had partially covered the center of the addition's tile floor. In its stead, Newberry installed a wall-to-wall carpet that covered the addition's tile floor from baseboard to baseboard. Newberry laid the carpet using carpet tacking strips around the entire perimeter of the floor to ensure that the carpet stayed down. "In the course of installing [the] carpet, [Newberry] saw every inch of the border of that room." Shortly after installing the wall-to-wall carpet, Newberry placed the house for sale-by-owner.

Appellant Robert Quill saw the for-sale-by-owner sign and called about the house. Quill arranged to walk through the house with Newberry. At that time, Newberry told Quill that the residence was a "turnkey" house, meaning to both men that the house was in perfect condition and the purchaser could move in immediately. Newberry also told Quill that he had a continuous contract with an exterminator and that someone came and sprayed once a year.

Quill put a contract on the house. As required by law, Newberry provided to Quill a Seller's Disclosure Form. In that form, Newberry specifically stated that he had no "knowledge of termites, dryrot, or pests on or affecting the property"; that he had no "knowledge of any damage to the property caused by termites, dryrot, or pests"; that his property is "currently under warranty or other coverage by a licensed pest control company"; and that he did not "know of any termite/pest control reports or treatments for the property in the last five years[.]" In addition, Newberry wrote by hand, "Have regular House treatments."

Prior to closing on the house, Quill had a licensed inspector, Ed Gibson, walk through the house. Although Gibson's contract to inspect the house specifically excluded any inspection for termites or termite damage, he would have noted such damage in his report if it had been visible. Gibson noted no damage.

In addition, five minutes before the July 17, 1997 closing on the property was completed, Norman Terrell of Northwest Exterminating arrived with the requisite termite inspection letter, which letter stated that there was no evidence of active termite infestation in the residence. Terrell did not inspect the inside of the house prior to preparing the letter.

The closing was on Wednesday, July 16, 1997. On Saturday, July 19, 1997, Quill arrived at his new house with tools, painting equipment, and two friends to help him. Quill intended to repaint the walls and to refinish the floors. He started in the addition where he pulled up the new carpet. "In . . . th[e] far corner, it was immediately obvious that the floor was sunken. The floor along that one wall . . . was all soft and squishy. And that corner there was foam coming up around the hexagonal or whatever the shapes of the tile was. The tiles were loose and could be easily picked up, which I did pick up.

And it was obvious to me that there was an insect infestation there which I believed to be termites." At that time, Quill enlisted the aid of his friends, and they followed the infestation from the floor itself into the floorboards and up behind the sheetrock walls of the addition. "All three walls the floor and the ceiling [of the addition were] all affected with termite infestation and substantial damage." As Quill pulled open the sheetrock, he followed the infestation into the kitchen and behind the kitchen cabinets. "It was an obvious trail of where the damage was and where the termite damage was, and I continued to explore. And in fact in the exploration in taking sheet-rock out and everything, the termites were falling out all over my arms and biting my arms. . . . There were thousands of them."

Further investigation showed that holes had been drilled into the ground outside of the house behind the addition. The holes extended into the back of the house below the ground level. Structural insulating foam had been injected through the holes and up under the collapsed corner of the addition's floor, thereby propping up the floor. The hardened foam had bits of wood in it, demonstrating that the floor was eaten through at the time the foam was injected. Thereafter, the holes on the outside of the house had been covered with concrete. Residual traces of the foam could be seen on the concrete. White landscape gravel had been placed over the concrete, thereby masking it. In the addition, besides the wall-to-wall carpet which concealed the condition of the wood floor, mesh tape had been placed over damaged areas of drywall and then patched and painted over. Estimates placed the amount of termite damage as high as $45,000. Upon order from the Department of Agriculture, Northwest Exterminators informed Quill that they would treat the back addition upon demolition or removal of the entire floor.[2]

Quill immediately filed a complaint seeking to rescind the contract, obtain the money he put down on the house, and return to the status quo. Quill also filed a motion for an interlocutory injunction in order to restrain Newberry from disposing of the assets of the sale of the Argonne Avenue property prior to the outcome of the pending litigation on Quill's complaint. Specifically, Quill sought to enjoin Newberry from selling a Briar Hills Drive residence that he had purchased with part of the proceeds from the sale of the Argonne Avenue property. Quill's contention in the motion was that Newberry would subsequently dispose of or hide the assets from the sale of the Briar Hills Drive property, thereby frustrating any recovery Quill might obtain pursuant to his complaint.

---

[2] Under the terms of the contract pursuant to obtaining the termite letter for closing, Northwest was obligated to treat the house for termites.

The trial court denied Quill's motion for an interlocutory injunction. The court made a specific factual finding that "[t]he evidence in this case is in conflict, and as previously stated, the court in its discretion denies the plaintiff's request for an interlocutory injunction." Thereafter, Quill filed a notice of lis pendens against the Briar Hills Drive property. In response, Newberry filed a motion for contempt against Quill.

Newberry also filed the instant motion for summary judgment based upon the record. Inter alia, the record includes:

(a) Newberry's testimony that he did not know about the termite infestation and that, when he installed the wall-to-wall carpet in the addition just before he put the house on the market, he saw no loose tiles, no cracked tiles, no foam coming through the tiles, no damage to the floor around the baseboards, and the floor was solid.

However, the record also contains multiple pictures taken only six months after the carpet was installed and showing the extent of the termite infestation and damage to the floor of the addition, including the damaged appearance of the tiles, cracked tiles, the appearance of the insulating foam coming between loose tiles, and the extensively damaged flooring around the perimeter of the floor near the baseboards. Quill also testified regarding the fact that the damage to the floor of the addition was immediately apparent once the wall-to-wall carpet was removed. Further, Quill testified that the damage was estimated at $45,000.

(b) Evidence that *prior* to the sale of the house, Newberry represented to Quill, both orally and on the Seller's Disclosure Form, that Newberry had a continuous pest control contract and that the house was "treated regularly."

However, the record also contains Newberry's testimony, *subsequent* to the sale, that he did not have the house treated regularly and that he never had a continuous pest control contract. Norman Terrell, the representative of Northwest Exterminating who Newberry previously alleged treated the house regularly, testified that he had treated the house only once several years earlier for black ants.

(c) Newberry's testimony that a handyman he hired, Roger Amburgy, never "restructured" the back of the house at Newberry's request: "No, [Amburgy] did not restructure the back of the house, no"; Amburgy would not "have done something [Newberry] had not asked him to do"; and if Newberry paid Amburgy for work, "it was not only completed but it was also completed at [Newberry's] request."

However, the record also includes a paid invoice from Amburgy to Newberry for 18.5 hours over two days spent "restructur[ing] the back of the house."

(d) Newberry's testimony that Amburgy did not "patch and paint

drywall" in the kitchen and addition, the only rooms in the house that had sheetrock, not plaster.

However, the record also contains Amburgy's paid invoice for "paint and patch drywall, ten hours."

(e) Newberry's testimony that during the inspection for the termite letter, Norman Terrell "went in and out of every room."

However, the record also contains Terrell's testimony that during the inspection for the termite letter, "I [Terrell] did not inspect the interior of the home."

Although the trial court had found that "the evidence is in conflict" when previously denying Quill's motion for interlocutory injunction, the trial court granted Newberry's motion for summary judgment. In so doing, the trial court noted that Newberry had unequivocally stated that he did not know of the termite infestation. Citing our recent case of *Supchak v. Pruitt*, 232 Ga. App. 680 (503 SE2d 581) (1998), the trial court held that,

> Plaintiff's inferences disappear in the face of defendant's uncontradicted and unimpeached evidence. The court finds that the evidence is undisputed that defendant Newberry did not know of the termite infestation and that there is no evidence sufficient to create a jury issue on the element of scienter.

*Held*:

1. In his first enumeration of error, Quill contends that the trial court erred in finding that Newberry's sworn denial of knowledge of the termite infestation negated any circumstantial evidence to the contrary and thereby created no issue of fact for the jury to determine. Quill argues that,

> [i]f, as is almost always the case, the defendant simply denies his fraudulent conduct under oath, under [the trial court's] approach, absent an eyewitness to the fraudulent conduct, there is no recovery for fraud, as any contrary circumstantial evidence simply "disappears" in the face of a sworn denial.

We agree.

(a)

> The standards applicable to motions for summary judgment generally are announced in *Lau's Corp. v. Haskins*, 261 Ga. 491 (405 SE2d 474) [(1991)]. When ruling on a motion for summary judgment, the opposing party should be given the benefit of all reasonable doubt, and the court should con-

strue the evidence *and all inferences* and conclusions therefrom most favorably toward the party opposing the motion. Further, when reviewing the grant or denial of a motion for summary judgment, this court conducts a de novo review of the law and the evidence.

(Citations omitted; emphasis supplied.) *Supchak v. Pruitt*, supra at 682 (1).

(b)

Since fraud is inherently subtle, slight circumstances of fraud may be sufficient to establish a proper case. Proof of fraud is seldom ever susceptible of direct proof, thus recourse to circumstantial evidence *usually is required.* Moreover, it is peculiarly the province of the jury to pass on these circumstances showing fraud. Except in plain and indisputable cases, scienter in actions based on fraud is an issue of fact for jury determination.

(Citations and punctuation omitted; emphasis supplied.) *Lloyd v. Kramer*, 233 Ga. App. 372, 373 (1) (503 SE2d 632) (1998).

(c) Generally, if a defendant did *not* deny scienter as to what otherwise would be a fraudulent act, neither litigation nor subsequent appeal would even be necessary. Thus, if scienter in a fraud case is normally proved through circumstantial evidence raising inferences to contradict a defendant's denial of scienter, then such inferences cannot be negated simply through the defendant's denial, itself. This is why scienter is "peculiarly" a jury issue; it deals with the choice of what to believe regarding a subjective state of mind seldom capable of direct proof. Clearly, making a *choice* as to what to believe has no place in summary judgment, which is granted "only where the evidence is plain, palpable and undisputable." *Robinson v. Kroger Co.*, 268 Ga. 735, 739 (1) (493 SE2d 403) (1997).

(d) Our decision in *Supchak v. Pruitt*, supra, does not hold to the contrary. *Supchak v. Pruitt* was a negligence case, not a fraud case. The question was who, among the named defendants, owned a horse that had caused damage. In *Supchak v. Pruitt*, the evidence was plain, palpable and undisputable that a named defendant was the sole owner of the horse. No inference could be drawn otherwise, since the named defendant admitted against interest that he was the sole owner of the horse, and no evidence contradicted such admission. This type of objective, *factual* question is capable of direct proof. And our holding in *Supchak v. Pruitt* was addressed to those objective, factual issues that are capable of direct proof, not the credibility decisions that are inherently the essence of scienter. In *Supchak v. Pruitt*,

we did not intend to negate the long standing, statutorily mandated principle that, upon motion for summary judgment, all inferences must be drawn in favor of the non-moving party. OCGA § 9-11-56 (c); *Robinson v. Kroger Co.*, supra; *Lau's Corp. v. Haskins*, supra.

(e) Here, the evidence includes the timing of the laying of the wall-to-wall carpet covering the termite damaged floor in relation to the sale of the home; the extent of the termite damage that was readily apparent when the carpet was removed; the taping, painting, and patching of the addition's sheetrock walls which were otherwise ravaged with termite damage; Newberry's false representation that the house was treated regularly for termites and that he had a contract therefor; Newberry's "restructuring the back of the house" where the termite infestation and damage was at its worst; evidence of the extent of the infestation, including that there were "thousands" of termites in the floor, ceiling, and falling out of the walls; and evidence that $45,000 worth of termite damage had been done to the house, making necessary the removal of the entire floor. This evidence raises the inferences that Newberry was aware of the termite infestation, sought to mask it, and falsely represented to Quill that the house was without a termite problem in order to induce Quill to purchase the property. Contrary to the trial court's finding, Newberry's sworn statement that he did not know of the infestation does not make the above-referenced inferences "disappear," but instead creates a jury issue as to scienter. The trial court's grant of summary judgment was error.

2. Quill's remaining enumerations of error are without merit.

(a)

> Under OCGA § 44-14-610, a notice of lis pendens is authorized only as to a suit in which real property is "involved." This refers only to the realty actually and directly brought into litigation by the pleadings in a pending suit and as to which some relief is sought respecting that particular property.

(Citations and punctuation omitted.) *Moore v. Bank of Fitzgerald*, 266 Ga. 190 (465 SE2d 445) (1996).

> Lis pendens may not be predicated upon an action or suit which seeks merely to recover a money judgment. Rather, its purpose is to notify prospective purchasers that the property in question is *directly involved* in a pending suit, in the sense that the suit seeks some relief respecting that particular property.

(Citations and punctuation omitted; emphasis supplied.) *Evans v.*

*Fulton Nat. Mtg. Corp.*, 168 Ga. App. 600, 601 (309 SE2d 884) (1983). Here, Quill's action is against Newberry for fraud, which action does not involve the Briar Hills Drive property. Quill seeks a monetary recovery from Newberry, and if a third party were to buy the Briar Hills Drive property from Newberry, Quill could not reach the Briar Hills Drive property to satisfy any money judgment he may obtain from Newberry. Instead, Quill would have to go after the proceeds of the sale. Accordingly, the trial court properly ordered the removal of the notice of lis pendens against the property.

(b) The trial court in its discretion properly denied Quill's motion for attorney fees in defending against the contempt action filed by Newberry in response to Quill's filing of an inappropriate notice of lis pendens. OCGA § 9-15-14 (b); *Gibson v. Southern Gen. Ins. Co.*, 199 Ga. App. 776, 778 (3) (406 SE2d 121) (1991).

*Judgment reversed. Pope, P. J., and Smith, J., concur.*

DECIDED MAY 20, 1999.

*Chad A. McGowan*, for appellant.

*Wood & Meredith, Hugh C. Wood, Dwight A. Meredith*, for appellee.