A08A0209. ASUAMAH v. HALEY et al.
A08A0210. ASUAMAH v. CENDANT MOBILITY FINANCIAL
CORPORATION.
(666 SE2d 426)

MIKELL, Judge.

These appeals arise from the grant of summary judgment to the defendants, the listing real estate agent/listing brokerage, and the seller, on the plaintiff/purchaser's claims for fraud, rescission, breach of contract, and negligence. We affirm the judgment in Case No. A08A0209, the action against the real estate agent/listing broker, Barbara Haley and Coldwell Banker Residential Real Estate, Inc. ("Coldwell Banker"). In Case No. A08A0210, we reverse the grant of summary judgment to the seller, Cendant Mobility Financial Corporation ("Cendant"), on the claim that it negligently repaired the property.[1] The judgment on the remaining claims is affirmed. The relevant facts follow.

Udeme Asuamah purchased a townhome in Atlanta from Cendant on June 28, 2005. When she moved in one month later, Asuamah discovered waterlogged carpeting and falling sheetrock in the dining room, among other water-related problems. Asuamah contacted Shelly Gee, the real estate agent who handled the transaction for Asuamah, as well as Haley. After speaking with Asuamah, Haley gave her a 20-page mold screening inspection report (the "mold report"), which showed extensive water stains and mold throughout the home. Asuamah had not seen the mold report before she purchased the townhome. Gee, however, admitted that the report had been in the townhome when she first showed it to Asuamah's brother, Philip Samuel Asuamah ("Phil"). Gee claimed

---

[1] See Division 4 (b), infra.

that she did not notice it, but that she had given a "stack of information" to Phil. Phil denied ever receiving a copy of the mold report, and it is undisputed that Gee did not give the mold report to Asuamah prior to closing.

Asuamah, however, did not sue Gee. Asuamah filed a complaint against Coldwell Banker, Haley, and Cendant, alleging, inter alia, that her name had been forged on the seller's real estate disclosure sheet ("SRED"), which stated in part that Asuamah acknowledged that she had received a copy of the mold report from Cendant; that material facts and defects in the property were not disclosed to her; and that the defendants and their attorneys conspired to defraud her. These claims were based in part on the defendants' failure to disclose that the property previously had been the subject of litigation due to water-related problems. Asuamah sought to rescind the contract and to recover consequential and punitive damages, as well as attorney fees. She amended her complaint to add claims of breach of contract and negligence against Cendant. Coldwell Banker and Haley moved for summary judgment, and Cendant joined the motion. In separate orders, the trial court granted summary judgment to the defendants and entered final judgment in their favor. In Case No. A08A0209, Asuamah appeals the judgment entered in favor of Coldwell Banker and Haley, and in Case No. A08A0210, she appeals the judgment entered for Cendant. Because the enumerated errors are similar, we consolidate these appeals for disposition in a single opinion. Although Asuamah has enumerated thirteen errors, they relate to only five claims: fraud, breach of contract, equitable rescission, negligence, and discovery. For clarity, we group the enumerations of error according to claim.

1. Asuamah contends that the trial court erred in granting summary judgment to the defendants on her claim for fraud and rescission. In a related enumeration of error, Asuamah claims that the trial court granted summary judgment against her solely on the basis of her deposition testimony that she would not have purchased the property had she known of the mold report. We disagree.

A fraud action requires proof of five elements: (1) a false representation or omission of a material fact; (2) scienter; (3) intention to induce the plaintiff to act or refrain from acting; (4) justifiable reliance; and (5) damages.[2]

> For an action for fraud to survive a motion for summary judgment, there must be some evidence from which a jury could find each element of the tort. In deciding whether the

---

[2] *ReMax North Atlanta v. Clark*, 244 Ga. App. 890, 893 (537 SE2d 138) (2000); *Fowler v. Overby*, 223 Ga. App. 803 (478 SE2d 919) (1996).

114

evidence presented is sufficient to raise a triable issue as to each element, the court must resolve all disputes of fact and indulge all reasonable inferences therefrom in favor of the nonmoving party.[3]

We conduct a de novo review of the law and the evidence on appeal from the grant of a motion for summary judgment.[4] Because defendants need eliminate only one essential element of Asuamah's claim to prevail at summary judgment,[5] "we need not address all the issues raised on appeal or in the motion for summary judgment to resolve this appeal."[6] Even viewed with every inference indulged in favor of Asuamah, the evidence demands a judgment for the defendants on the fraud claim because the evidence demonstrates conclusively that they disclosed the mold report and that Gee had the mold report and failed to disclose it to Asuamah. Thus, she cannot establish that, with the exception of alleged negligent repairs by Cendant, her damages flowed from the actions of these defendants.

In Haley's affidavit tendered in support of the motion for summary judgment, Haley averred that Cendant provides real estate location services to transferred employees, and Coldwell Banker manages and lists those employees' properties; Coldwell Banker first listed the townhome at issue in 2000 for Cendant, which was handling the property for a transferred employee; in 2001 the property was sold to Beverly McCannon; McCannon sued these same defendants for failing to disclose water leaks that led to mold contamination; the McCannon litigation settled in 2004, and Cendant took back the property. Haley further averred that after the suit was settled, the property listing was reassigned to her, and she hired a company to check for mold contamination, resulting in the mold report; that a company was hired to remediate the mold contamination; the company performed the work and provided a transferable antimicrobial warranty; and that she then hired contractors "to put the property back together." Believing that the problems were repaired and the mold was gone, Haley relisted the property for sale. She put a set of blank contract forms, the SRED, the mold report, a lead paint disclosure, and a few other items on the kitchen counter. The mold report revealed extensive water stains and mold throughout the home and stated that "water damage was previously reme- diated in the residence." Haley received an offer from Asuamah

---

[3] (Citations and punctuation omitted.) *Smith v. Stanley*, 223 Ga. App. 334, 335 (477 SE2d 618) (1996).

[4] *Ikola v. Schoene*, 264 Ga. App. 338, 339 (590 SE2d 750) (2003).

[5] See *Lau's Corp. v. Haskins*, 261 Ga. 491 (405 SE2d 474) (1991).

[6] *Real Estate Intl. v. Buggay*, 220 Ga. App. 449, 451 (2) (469 SE2d 242) (1996).

through Gee and negotiated the terms of the contract through Gee. Haley requested and received from Gee five original contracts signed by Asuamah and Gee; a SRED signed and initialed by Asuamah and a witness showing that Asuamah had received all the disclosure documents; a lead paint disclosure signed and initialed by Asuamah; and a corporate listing form signed by Gee and Asuamah explaining that the property was being sold by a corporate client rather than an individual seller.

Upon receiving these documents, Haley believed that Asuamah had received and reviewed all the disclosure documents, including the mold report. Haley averred that she did not forge Asuamah's name or initials to the SRED. Haley sent the contracts to Cendant's signing agent, who signed and returned them to Haley. Haley kept one and sent the other four originals to Gee. Asuamah had the property inspected, and Haley received from Gee an inspection report showing minor issues. Haley and Gee negotiated an agreement whereby Cendant would pay $540 to a contractor of Asuamah's choosing in lieu of making repairs. The day before closing, Haley went to the property to check for any moisture problems; she took off her shoes, walked through the dwelling, and did not observe or feel any signs of leaks, moisture or mold. A month after the closing, Asuamah called Haley to report a leak and asked whether there were any disclosures for the property. Haley stated that she had a signed document indicating that Asuamah had already received them. Asuamah realized that she had not and asked for a copy, which Haley provided.

In her deposition, Haley admitted, however, that the homeowner's disclosure to which the SRED referred was not from McCannon; rather, it was provided by a prior owner, Sharon Hunter. Haley testified that she first became involved with the property in 2001, when it was under contract with McCannon; that some work was performed by a construction company before that closing, that the company had reported "massive amounts of water trapped behind the walls"; and that after closing, McCannon complained about water penetration and mold contamination. After Cendant took back the property and Haley assumed its management, all of the back walls, the fireplace mantels, and sheetrock under the kitchen window had been removed. With verbal approval from Cendant, Haley authorized various contractors to repair the property.

Gee deposed that when she showed the property to Asuamah's brother, Phil, she picked up a stack of documents that were laying on the kitchen counter. The documents included the mold report, which Gee claimed she did not notice. Phil and Gee spoke with Asuamah, and she decided to make an offer but instructed Gee to deal with Phil. Gee faxed a contract to Phil, and then called Haley to

communicate the offer. After reaching a verbal agreement with Haley on price and closing costs, Gee met with Asuamah at the property. Gee testified that she called Haley from the property because the stack of papers in the home seemed smaller; Haley told her to look in the drawers, but Gee did not see anything else. Gee testified, however, that she knew the mold report had been in the home at the first showing because she had a copy of it in her file. Gee also testified that she asked Phil whether he had given the stack of information to Asuamah, and he said he did. Phil deposed, however, that he never received the mold report.

Gee admitted that the SRED was in the home when she showed it to Asuamah. The SRED states: "Buyer(s) acknowledge that Cendant Mobility has delivered copies of the following disclosure documents to Buyer(s) which Buyer(s) have read and understand. . . ." Listed are three reports: mold (twenty pages, dated July 19, 2004), lead paint disclosure (two pages), and homeowner's real estate disclosure (three pages). The initials "UA" appear by the name of each report on the SRED; the SRED is purportedly signed by Asuamah; it is witnessed by Gee, who signed as "S Baker"; and it is dated May 22, 2005. Gee testified that Asuamah initialed the SRED in the appropriate places, signed it in Gee's presence, and did not ask Gee any questions about any of the documents signed that day. Gee did not alert Asuamah to the mold report because Asuamah had instructed Gee to deal with Phil, and Gee had previously given him all the documents. Gee testified that the reason she signed her name as "Baker" is because that is her maiden name, and she uses it and Gee interchangeably. Regarding her relationship with Asuamah, Gee first testified that Asuamah was her client; however, Gee later deposed that she acted as a transaction broker. Gee also deposed that she never signed a buyer's agency agreement with Asuamah.

Gee testified that she did not mention the report to Phil because she did not read it or any other document she picked up. Gee further testified that she did not give the mold report to Asuamah because she had already given it to Phil and because she could not find it in the property when she later showed the home to Asuamah.

Asuamah deposed that her signature and initials had been forged on the SRED and that she had never received it or the mold report. Asuamah testified that Gee had only given her the lead paint disclosure, and Asuamah did not know that there were other disclosures. After closing, Asuamah discovered a report of an inspection performed on February 13, 2005, on behalf of a buyer who did not proceed to closing. This report states:

> Buyer is aware that this dwelling has recently been remediated for mold issues. Major renovations were recently

completed. Fresh paint and drywall noted in dwelling. *Buyer must refer to remediation documentation for all mold related issues, previous repairs & any related concerns whatsoever as they can not be visibly detected by the naked eye during a home inspection.*

(Emphasis in original.) The inspection revealed mold, and remediation was recommended. But the buyer's agent, Stacey Evans, averred that she faxed to Haley only the summary page of the report, which stated that "the mold inspection findings were OK." Evans averred that she never received a copy of the inspector's mold test results and, therefore, never sent them to Haley. Evans also stated that the mold report was on the kitchen counter when she first viewed the townhome. Asuamah had an inspection performed prior to closing, but the inspection did not reveal mold. Asuamah never communicated directly with Haley or Cendant before the closing, as she believed that Gee was representing the seller.

When Asuamah moved into the townhome, she encountered leaks, soaking wet carpeting, and falling sheetrock in the dining room. Asuamah contacted the closing attorney, who gave her a copy of the SRED but not the reports disclosed thereon, and instructed her to call the seller's agent. Asuamah called Gee and Haley; Haley provided her with a copy of the mold report and an antimicrobial warranty. According to Asuamah, Gee did not recall any disclosures on the property. After reading the mold report, Asuamah testified: "There's no way I would have bought that house, no way, if I knew it had that kind of mold problem. It just wouldn't have happened."

Asuamah argues that the trial court erred in granting summary judgment based on her statement that she would not have closed on the property had she been given the mold report. She further claims that questions of fact remain on her fraud claim because the defendants failed to disclose the McCannon litigation and instead, after the closing, provided a disclosure from a prior owner, thus attempting to conceal the defects in the property. Following the grant of summary judgment to Haley and Coldwell Banker on all claims and to Cendant on the fraud and rescission claims, Asuamah filed the affidavit of an engineer, Edward Haight, whom McCannon had hired to inspect the home in 2003. Haight had discovered numerous structural deficiencies that caused water penetration. After being hired by Asuamah, Haight directed that sections of the sheetrock around the windows and basement wall be removed, and he discovered the same structural defects he had observed and reported to Cendant in 2003.

Fraud in the sale of real estate may be predicated upon a wilful misrepresentation, i.e., the seller tells a lie; upon active concealment where the seller does not discuss the defect but takes steps to prevent its discovery by the purchaser; and thirdly a passive concealment where the seller does nothing to prevent the discovery but simply keeps quiet about a defect which though not readily discernible, is known to the seller.[7]

In the case at bar, we cannot consider the Haight affidavit as it relates to the fraud claims because it was filed after the trial court granted summary judgment on those claims. "Appellate courts will review only evidence presented to the trial court before its ruling on the motion."[8] Moreover, even if a question of fact exists concerning concealment of the McCannon litigation, it does not affect the outcome, because it is undisputed that the defendants did not conceal the mold report, and the report and the McCannon litigation relate to the same defects: water damage and mold. The report was issued after Cendant reacquired the property from McCannon and disclosed that water damage had been remediated. The evidence is undisputed that Haley disclosed the mold report by leaving a copy of it in the property for all prospective purchasers. Gee admitted retrieving a stack of documents from the kitchen counter in the townhome and, further, that the mold report was in her file. The mold report specifically states that both the upstairs level and the main level of the residence "exhibited evidence of multiple sources of water intrusion" and that "[a]ir . . . sampling confirmed elevated levels of mold in the basement." The mold report revealed extensive water stains and mold throughout the home and stated that "water damage was previously remediated in the residence." It is undisputed that Gee took a copy of the mold report but failed to give it to Asuamah. Had Asuamah received the mold report, she would have been charged with notice of any problem or defect to which her subsequent inquiry might have led. "Notice sufficient to excite attention and put a party on inquiry shall be notice of everything to which it is afterwards found such inquiry might have led."[9] Thus,

---

[7] (Citation omitted.) *Holloman v. D.R. Horton, Inc.*, 241 Ga. App. 141, 143 (2) (524 SE2d 790) (1999).

[8] (Citation and punctuation omitted.) *T & R Custom v. Liberty Mut. Ins. Co.*, 227 Ga. App. 144, 145 (1) (488 SE2d 705) (1997).

[9] (Citation and punctuation omitted.) *Webb v. Rushing*, 194 Ga. App. 732, 733 (2) (391 SE2d 709) (1990). See OCGA § 23-1-17. See also *Westminster Holdings v. Weatherspoon*, 237 Ga. App. 819, 820-821 (1) (517 SE2d 80) (1999) (buyer waived termite damage repair requirement by closing despite seller's failure to provide documentation of repair as required by agreement).

through the mold report, the defendants disclosed the defects in the property.

Furthermore, Gee had a duty to disclose the report to Asuamah. The duties of a real estate agent are prescribed by the Brokerage Relationships in Real Estate Transactions Act (BRRETA), OCGA § 10-6A-1 et seq. OCGA § 10-6A-14 (b) provides that a broker acting as a "transaction broker" shall timely disclose

> to all buyers . . . with whom the broker is working: . . . [a]ll adverse material facts pertaining to the physical condition of the property and improvements located thereon including but not limited to material defects in the property, environmental contamination, and facts required by statute or regulation to be disclosed which are actually known by the broker which could not be discovered by a reasonably diligent inspection of the property by the buyer.[10]

Asuamah argues that Gee was Cendant's agent and, as such, that Cendant and Coldwell Banker were bound by Gee's and Haley's misrepresentations. Asuamah further contends that Gee was a subagent of the listing broker.[11] But that relationship is not specified in BRRETA and is, presumably, preempted by it.[12] Asuamah believed that Gee represented the seller, while Gee testified, and the defendants argue, that she acted as a "transaction broker," as defined by OCGA § 10-6A-3 (14):

> "Transaction broker" means a broker who has not entered into a client relationship with any of the parties to a particular real estate transaction and who performs only ministerial acts on behalf of one or more of the parties, but who is paid valuable consideration by one or more parties to the transaction pursuant to a verbal or written agreement for performing brokerage services.

Here, Gee did not enter into a written agreement with Asuamah or

---

[10] OCGA § 10-6A-14 (b) (3) (A).

[11] See *Hill v. Century 21 &c. Realty*, 187 Ga. App. 754 (371 SE2d 217) (1988); *Jim Royer Realty v. Moreira*, 184 Ga. App. 848 (363 SE2d 10) (1987) (Deen, J., concurring specially).

[12] See OCGA § 10-6A-2 (a): "The provisions of this chapter are enacted to govern the relationships between sellers, landlords, buyers, tenants, and real estate brokers and their affiliated licensees to the extent not governed by specific written agreements between and among the parties." See also *Killearn Partners v. Southeast Properties*, 279 Ga. 144, 145-146 (1) (611 SE2d 26) (2005) (explaining real estate broker's various relationships as defined by BRRETA).

Cendant; thus neither party was her "client."[13] Rather it appears that Asuamah was Gee's "customer," which BRRETA defines as "a person who is not being represented by a real estate broker in an agency capacity pursuant to a brokerage engagement but for whom a broker may perform ministerial acts."[14] "Ministerial acts," in turn, "do not require the exercise of the broker's . . . professional judgment or skill,"[15] but do include "provid[ing] assistance" to buyers or sellers by "acting as a scribe" in the preparation of contracts and timely presenting offers to and from the parties to the sale.[16] Asuamah argues that Gee cannot be deemed a transaction broker as a matter of law because she was required to exercise professional judgment in negotiating the contract.[17] We disagree. We find that the evidence establishes that Asuamah was Gee's "customer," so that Gee was a transaction broker. As such, Gee was required to disclose to Asuamah the mold report, which was clearly disclosed on the SRED and which Gee admitted having in her file. The defendants, of course, had the same obligation of disclosure.[18] "One method by which the buyer is informed of defects in the property is the sellers' disclosure statement. Therefore, [BRRETA] necessarily implies a duty to provide the seller's disclosure statement to the buyer."[19] Haley placed the mold report in the home and later received a SRED, which was purportedly signed by the prospective buyer. Thus, she fulfilled her obligation under BRRETA. Moreover, even though Asuamah testified that her signature on the SRED was forged, she presented no evidence contradicting Haley's testimony that she did not forge Asuamah's signature. Even if it could be inferred that Haley did so, such an inference has no probative value against the direct testimony that Haley did not do so.

> In ruling on a motion for summary judgment, a finding of fact that may be inferred from, but is not demanded by, circumstantial evidence has no probative value against positive and uncontradicted evidence that no such fact

---

[13] See OCGA § 10-6A-3 (6).

[14] OCGA § 10-6A-3 (8).

[15] OCGA § 10-6A-3 (12).

[16] OCGA § 10-6A-14 (a) (4), (b) (1).

[17] See *Killearn Partners*, supra at 146 (1) ("Relationships between a broker and a customer normally do not involve the exercise of professional judgment or skill, and may be established either orally or in writing") (footnote omitted).

[18] OCGA § 10-6A-5 (b) (1) (seller's broker). See also OCGA § 10-6A-14 (c): "Nothing in this subsection shall limit any obligation of a seller under any applicable law to disclose to prospective buyers all adverse material facts actually known by the seller pertaining to the physical condition of the property."

[19] *Ikola*, supra at 342 (buyer's agent had duty under BRRETA to provide the seller's disclosure statement to the buyer).

exists, provided that the circumstantial evidence may be construed consistently with the direct evidence.[20]

Here, the circumstantial evidence may be construed consistently with the direct evidence. The record shows that after Gee and Asuamah inspected the property, they went to Kinko's to sign the contract documents. Gee deposed that she witnessed Asuamah sign the disclosure form. Specifically, Gee testified:

Q. Did she ask you what this mold report that was referenced 20 pages by U. S. Inspect?
A. No, we were just signing.
Q. And Ms. Asuamah signed the seller's real estate disclosure down here where it says buyer?
A. Yes.
Q. And the next page is a document entitled addendum, . . . lead paint?
A. Yes.
Q. Ms. Asuamah put her initials in two places up near the top of that document; is that right?
A. Yeah.
Q. And that was at Kinko's that day?
A. Yeah.

We are mindful that

if scienter in a fraud case is normally proved through circumstantial evidence raising inferences to contradict a defendant's denial of scienter, then such inferences cannot be negated simply through the defendant's denial, itself. This is why scienter is "peculiarly" a jury issue; it deals with the choice of what to believe regarding a subjective state of mind seldom capable of direct proof.[21]

In the case at bar, however, any inference as to forgery *committed by Haley* is not negated simply through her denial alone. It is negated by Gee's deposition testimony that she watched Asuamah sign the document. For these reasons, we hold that the trial court did not err

---

[20] *First Citizens Bank of Clayton County v. All-Lift of Ga.*, 251 Ga. App. 484, 486 (555 SE2d 1) (2001).
[21] *Quill v. Newberry*, 238 Ga. App. 184, 189 (1) (c) (518 SE2d 189) (1999) (court erred in granting summary judgment when evidence showed that seller knowingly concealed extensive termite damage).

in granting summary judgment to the defendants on the fraud claim.

2. Asuamah contends the trial court erred in granting summary judgment on her breach of contract claims. We disagree.

(a) Haley and Coldwell Banker. Asuamah did not enter into an agreement with these defendants; Asuamah was not their "client" and did not enter into a "brokerage engagement" with them, as those terms are defined in BRRETA.[22] Thus, Asuamah cannot claim that they breached any contract with her.

(b) Cendant. Asuamah claims that Cendant breached the sales contract by failing to disclose all material facts concerning the ownership of the property[23] and by failing to provide disclosures from McCannon. Asuamah bases this claim on a Coldwell Banker corporate listing form signed by Gee and Asuamah, which states, in pertinent part, as follows: "The sellers acquired this property via a corporate buyout and have not occupied the premises. Therefore, they cannot warrant or guarantee the condition or conformity of the property. If disclosures are obtained from the previous owners during acquisition, they will be provided." Asuamah asserts that the listing form is part of the sales contract and that Cendant's representation that it had limited knowledge of the property is false; therefore, Cendant breached the contract. Cendant argues that the contract's merger and nonsurvival clauses bar this claim. For reasons that follow, we conclude that the trial court did not err in granting summary judgment to Cendant on this claim.

Although Asuamah has alleged fraud, in this count of her complaint she has affirmed the contract and is suing for damages. Thus, she is bound by the terms of the contract and is subject to any defenses that may be asserted based on the contract.[24] The contract at issue contained a clause entitled "Non-Survival of Agreement. The closing of this sale and acceptance of the deed by the Purchaser shall constitute acknowledgement that the premises and systems contained therein are acceptable and the Seller shall have no further obligation . . . by virtue of this Agreement." The contract also contained an "entire agreement" or "merger" clause providing that "[t]his Agreement constitutes the sole and entire agreement between the parties hereto and no . . . representation, promise, or inducement not included in this Agreement shall be binding upon any party hereto." Finally, the contract stated that "closing shall constitute Purchaser's acceptance of the Property 'As Is.' "

---

[22] See OCGA § 10-6A-3 (4) ("brokerage engagement") and (6) ("client").

[23] Cendant owns Coldwell Banker, but Asuamah has not demonstrated the relevance of the corporate relationship.

[24] *Ben Farmer Realty Co. v. Woodard*, 212 Ga. App. 74, 75 (441 SE2d 421) (1994).

Having elected to affirm the contract within this count, Asuamah is bound by these clauses, and she is thus estopped from arguing that she relied on representations other than those contained in the contract. "[T]he entire agreement clause operates as a disclaimer, establishing that the written agreement completely and comprehensively represents all the parties' agreement."[25] Here, the contract did not provide that the corporate listing form had been made a part of the contract. Therefore, the contract's merger clause operated to bar a claim based on representations made on that form.[26]

3. Asuamah asserts that the trial court erred in granting summary judgment to Cendant on her equitable rescission claim. Asuamah argues that Cendant materially breached the contract by failing to disclose all material facts concerning ownership of the property. The remedy of equitable rescission is available on the ground of nonperformance of a contract.[27] Under this theory, "[a] breach of a contract as to a matter so substantial and fundamental as to defeat the object of the contract may authorize a rescission of the contract by the opposite party."[28] Within this enumeration of error, Asuamah reincorporates the arguments she made in her breach of contract and fraud claims: namely, that the failure to disclose the McCannon litigation and the reports associated with it materially breached the contract and entitled Asuamah to rescind it. We do not agree. Had Cendant concealed the mold report, and had the defects disclosed therein rendered the home uninhabitable, the grant of summary judgment might have been error.[29] But Cendant, through Haley, disclosed the mold report. Had Gee given it to Asuamah, she would have been charged with notice of any defect related to that report.[30] Failure to disclose matters related to the McCannon litigation did not defeat the fundamental purpose of the contract in view of the disclosure of the mold report.

---

[25] (Citations and punctuation omitted.) *Ainsworth v. Perreault*, 254 Ga. App. 470, 472 (1) (563 SE2d 135) (2002).

[26] See *Ekeledo v. Amporful*, 281 Ga. 817, 819 (1) (642 SE2d 20) (2007) ("In essence, a merger clause operates as a disclaimer of all representations not made on the face of the contract").

[27] See OCGA § 13-4-62: "A party may rescind a contract without the consent of the opposite party on the ground of nonperformance by that party but only when both parties can be restored to the condition in which they were before the contract was made."

[28] (Citations and punctuation omitted.) *Mayor &c. of Douglasville v. Hildebrand*, 175 Ga. App. 434, 436 (1) (333 SE2d 674) (1985).

[29] See *Lanier Home Center v. Underwood*, 252 Ga. App. 745-746 (1) (557 SE2d 76) (2001) (equitable rescission claim properly submitted to jury where there was evidence that failure of the septic tank system, which was placed in unsuitable soil by builder/seller's subcontractor, made home uninhabitable).

[30] *Webb*, supra.

4. Asuamah contends that the trial court erred in granting summary judgment to Cendant on her claims of negligent misrepresentation and negligent repairs.

(a) The essential elements of negligent misrepresentation are: "(1) the defendant's negligent supply of false information to foreseeable persons, known or unknown; (2) such persons' reasonable reliance upon that false information; and (3) economic injury proximately resulting from such reliance."[31] In support of this theory, Asuamah asserts that "the essence of Cendant's disclosure was a lie." Specifically, she refers to the statement that Cendant had limited knowledge of the property, given Haley's testimony that Cendant authorized the repairs after it took back the property from McCannon. But a cause of action for negligent misrepresentation generally applies to professional or expert defendants, who provide false information through the failure to exercise reasonable care, upon which foreseeable parties reasonably rely.[32] It differs from a claim of *wilful* misrepresentation. Under OCGA § 51-6-2 (a), "[w]illful misrepresentation of a material fact, made to induce another to act, upon which such person acts to his injury, will give him a right of action." This is a species of fraud. As stated in Division 1, "[f]raud in the sale of real estate may be predicated upon a wilful misrepresentation, i.e., the seller tells a lie."[33] The facts and circumstances of this case, as alleged by Asuamah, do not fit a negligent misrepresentation theory. She has, throughout her briefs, asserted claims based on fraud. Summary judgment was properly granted to Cendant on this claim.

(b) Asuamah argues that the trial court erred in granting summary judgment on her claim that Cendant negligently repaired the property or ratified the negligent actions of Haley acting as its general contractor. This claim has merit.

In support of this theory, she relies on *Wilmock, Inc. v. French*.[34] In that case, a homeowner sued the general contractor who built her home in negligence to recover damages for a malfunctioning septic tank system.[35] At trial, the homeowner produced evidence that the builder had accepted and thereby ratified an independent contrac-

---

[31] (Footnote omitted.) *Hardaway Co. v. Parsons, Brinckerhoff, Quade & Douglas, Inc.*, 267 Ga. 424, 426 (1) (479 SE2d 727) (1997) (contractor's suit against design engineer); *Robert & Co. Assoc. v. Rhodes-Haverty Partnership*, 250 Ga. 680, 682 (300 SE2d 503) (1983).

[32] See *Hardaway Co.*, supra (contractor's suit against design engineer); *Smiley v. S & J Investments*, 260 Ga. App. 493, 496 (2) (580 SE2d 283) (2003) (claim described as a "hybrid 'fraud' action, based upon professional negligence, not scienter") (physical precedent only), citing *Robert & Co. Assoc.*, supra at 681.

[33] (Citation omitted.) *Holloman*, supra at 143 (2).

[34] 185 Ga. App. 259 (363 SE2d 789) (1987).

[35] Id.

tor's installation and placement of the septic tank system and the grading of her property in such a way that it caused flooding of the septic system and a backup of waste water into her home.[36] We affirmed the judgment entered on the jury's verdict.[37]

Cendant argues that it cannot be held liable under this theory because it was not a builder/seller, as was the defendant in *Wilmock*.[38] We have not previously held a seller who did not build the home liable to the buyer for negligent repairs made thereto.[39] The seminal case creating an exception to the rule of caveat emptor for builder/sellers is *Holmes v. Worthey*,[40] in which we held that a home buyer could proceed on a negligence claim against the builder/seller for latent construction defects.[41] Asuamah correctly contends, however, that we left the door open for negligence claims against nonbuilder sellers in *Swiedler v. Ferguson*:[42]

> Having carefully analyzed our decision in *Holmes v. Worthey*, [cit.] we can state authoritatively that it did not hold, or mean to hold, that *only* a builder-seller may be held accountable for negligence in the sale of a house or building. However, that distinction is a fine one, for in concluding that a buyer does have a cause of action for negligence against a builder-seller, we relied upon the premise generally that the builder-seller is in the business of building and selling dwellings and thus is in a direct position of responsibility for the existence of any defects; and, moreover, is generally in a superior position to know of or discover latent defects which he created, and which the buyer could not reasonably discover. . . . None of these premises appl[ies] in the usual case of a sale of a dwelling by an owner or agent who did not build it.[43]

In *Swiedler*, we went on to affirm the grant of a j.n.o.v. to the seller

---

[36] Id. at 261 (1). See OCGA § 51-2-5 (6): "An employer is liable for the negligence of a contractor: . . . [i]f the employer ratifies the unauthorized wrong of the independent contractor."

[37] Id.

[38] Id.

[39] See *Stancliff v. Brown & Webb Builders*, 254 Ga. App. 224 (561 SE2d 438) (2002) (negligent construction claim against builder/seller); *Hall v. Harris*, 239 Ga. App. 812, 817 (3) (521 SE2d 638) (1999) (negligent repair claim against builder/seller); cf. *Pankowsky v. Sasine*, 218 Ga. App. 646, 647 (3) (462 SE2d 791) (1995) (negligence claim does not lie against ordinary seller).

[40] 159 Ga. App. 262 (282 SE2d 919) (1981).

[41] Id. at 272 (II), aff'd, *Worthey v. Holmes*, 249 Ga. 104, 105 (3) (287 SE2d 9) (1982).

[42] 195 Ga. App. 364 (393 SE2d 456) (1990).

[43] (Emphasis in original.) Id. at 365 (1).

on the purchaser's negligence claim, commenting that absent fraud, breach of contract, or an "immediately dangerous condition," it was improper "to found a cause for negligence on mere defective or inadequate conditions in a 'used' house, about which the buyer was not overtly or passively *misled*. Caveat emptor is still the general rule."[44]

Asuamah urges that we deviate from the general rule in this case because she has produced evidence, in the form of engineer Haight's affidavit, that defects he discovered in the home in 2007 were the same as those he observed in 2003 and discussed in his deposition with counsel for these defendants. We may consider this affidavit because Asuamah submitted it before the trial court directed the entry of final judgment to Cendant on this claim.[45] Haight averred that it did not appear that any attempt had been made to correct structural deficiencies which caused water penetration; that the work should have been specified and inspected by an engineer before the walls were covered up; that the defects were concealed behind the sheetrock and were not observable until he had it removed; that the work performed by Cendant's contractors was below standard; that Haley was unqualified to make decisions concerning structural repairs; and that her sole reliance on contractors instead of an engineer resulted in improper repairs.

We are persuaded to make an exception to the general rule in this case. This is an appeal from a grant of summary judgment; thus, we must view the evidence, and all reasonable conclusions and inferences that may be drawn from it, in the light most favorable to Asuamah, as the nonmovant.[46] Here, there is evidence that Cendant ignored the advice of an engineer in having the defects repaired; that indeed, such defects were not repaired; and that the defects were latent and could not be observed absent removal of the sheetrock, as noted in an inspection performed on February 13, 2005. Under these circumstances, it could be argued that Cendant was "in a superior position to know of or discover latent defects which [it] created, and which the buyer could not reasonably discover."[47] Thus, we hold that the trial court erred in granting summary judgment to Cendant on Asuamah's claim for negligent repairs.

5. Asuamah asserts that the trial court erred in denying her motion to stay her response to the summary judgment motion until discovery was complete, and, further, in failing to rule on her motion

---

[44] (Emphasis in original.) Id. at 366 (1).

[45] Compare *T & R Custom*, supra.

[46] *Matjoulis v. Integon Gen. Ins. Corp.*, 226 Ga. App. 459 (1) (486 SE2d 684) (1997).

[47] (Punctuation omitted.) *Swiedler*, supra at 365 (1).

to compel discovery from Cendant. The motion to stay was filed pursuant to OCGA § 9-11-56 (f), which permits the court to grant a continuance "[s]hould it appear from the affidavits of a party opposing the motion that he cannot, for reasons stated, present by affidavits facts essential to justify his opposition." The motion stated that Asuamah sought to depose counsel for Coldwell Banker and Haley concerning his knowledge of matters related to the McCannon litigation and repairs made to the property thereafter. Counsel, the same law firm who represented these defendants in that litigation, claimed attorney-client privilege. The trial court denied this motion as moot after granting summary judgment. Asuamah claims that further discovery was needed from counsel concerning the extent of repairs because of certain unsubstantiated assertions made by Haley in her affidavit that were not clarified in her two depositions. This assertion formed the basis of the motion to compel, in which Asuamah sought itemized repair bills for the property.

Our affirmance of the grant of summary judgment to Haley and Coldwell Banker render discovery issues moot in Case No. A08A0209. However, in light of our reversal of the summary judgment on the negligent repair claim against Cendant in Case No. A08A0210, we reverse the trial court's ruling and remand for the court to exercise its discretion and rule on the substance of Asuamah's discovery motions, insofar as they are relevant to this claim.

*Judgment affirmed in Case No. A08A0209. Judgment affirmed in part and reversed in part, and case remanded in Case No. A08A0210. Smith, P. J., and Adams, J., concur.*

DECIDED JULY 14, 2008 —
RECONSIDERATION DENIED JULY 31, 2008 — 

*Leon A. Van Gelderen*, for appellant.

*Weissman, Nowack, Curry & Wilco, John G. Nelson*, for appellees (case no. A08A0209).

*Scoggins & Goodman, David L. Rusnak, Scott H. Michalove*, for appellee (case no. A08A0210).